**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
PHYLLIS SIBILLA and NANCY SIBILLA,

      Plaintiffs,         **MEMORANDUM**
                    **AND ORDER**

    - against -          CV 10-1457 (AKT)

FOLLETT CORPORATION d/b/a
FOLLETT HIGHER EDUCATION GROUP,

        Defendant.
---------------------------------------------------------X

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.  PRELIMINARY STATEMENT

   Plaintiffs Nancy Sibilla and Phyllis Sibilla ("Plaintiffs" or the "Sibillas") assert claims

against Follett Corporation d/b/a Follett Higher Education Group ("Follett" or "Defendant") of

gender discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and New

York Executive Law § 290 *et seq.* ("New York State Human Rights Law" or "NYSHRL"),

disability discrimination under the Americans With Disabilities Act ("ADA") and the NYSHRL,

and age discrimination under the Age Discrimination in Employment Act ("ADEA") and the

NYSHRL in connection with Follett's decision to offer the Plaintiffs employment positions

subordinate to the ones they applied for at the Suffolk County Community College ("SCCC")

bookstore operated by Follett (the "Bookstore").  Defendant moved for summary judgment on all

claims [DE 23] and Plaintiffs opposed the motion [DE 33].

   Having considered Defendant's Memorandum of Law in Support of Defendant's Motion

for Summary Judgment [DE 24] ("Def.'s Mem."), Plaintiff's Memorandum of Law in Opposition

to Summary Judgment [DE 33] ("Pls.' Mem."), Defendant's Reply Memorandum of Law in

Further Support of Defendant's Motion for Summary Judgment [DE 34] ("Def.'s Reply Mem."), as well as the supporting affidavits and declarations, the parties' Local Civil Rule 56.1 Statements, and the oral argument conducted on December 7, 2011, the Court GRANTS Defendant's motion for summary judgment for the reasons that follow.

## II.    BACKGROUND FACTS

The following facts are drawn from the pleadings, Defendant's Rule 56.1 Statement, Plaintiffs' Rule 56.1 Counterstatement, and the parties' affidavits and memoranda of law in support of or opposition to the instant summary judgment motion.  The facts cited are undisputed unless otherwise noted.  Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the non-moving party.  *See Capobianco v. New York*, 422 F.3d 47, 50 (2d Cir. 2001).

### A.    Plaintiffs and the Bookstore

Nancy is a fifty-three (53) year old female who weighed in excess of 400 pounds in December 2009.  Pls.' 56.1 ¶ 262.  Nancy began working at the Bookstore in 1975.  Def.'s 56.1 ¶ 4.  Nancy's sister, Phyllis Sibilla, is a fifty-nine (59) year-old female who weighed 271 pounds at the time of the incidents giving rise to the Complaint.  Pls.' 56.1 ¶ 284.  Phyllis began working at the Bookstore in 1977.  Def.'s 56.1 ¶ 5.

SCCC has three campuses, Ammerman (also referred to as the Selden Campus), Riverhead (also referred to as the East Campus), and Grant (also referred to as the Brentwood or West Campus).  *Id.* ¶ 13.  From 1999 until 2009, all three bookstores were operated by Barnes & Noble College Bookstores, Inc. ("Barnes & Noble").  *See id.* ¶¶ 16, 68, 71.  The parties dispute the nature of the jobs previously held by the Sibillas.  Defendant maintains that Nancy was

officially an Assistant Manager and Phyllis was a Supervisor. *Id.* ¶¶ 45, 48. Plaintiffs assert that Nancy was a Store Manager and Phyllis was held out as an Assistant Manager. Pls.' 56.1 ¶¶ 45, 49.

**B.      The Transition of the Bookstore from Barnes & Noble to Follett**

In early 2009, SCCC solicited bids from Barnes & Noble and its competitors for the operation of all three SCCC bookstores. Def.'s 56.1 ¶ 68. Follett was the successful bidder. *Id.* ¶ 71. In late May 2009, Plaintiffs were informed by their manager at Barnes & Noble, Arlene Monaco ("Monaco"), that Barnes & Noble had lost its contract and that if the Plaintiffs wanted to continue working at the Bookstore, they would need to interview with Follett. *Id.* ¶ 72. On June 8, 2009, Follett Regional Manager T. J. Cochran ("Cochran") who was charged with evaluating and interviewing the existing staff, visited the Bookstore to deliver Follett job applications. *Id.* ¶¶ 76, 85. He was there for less than five minutes, but returned for a second visit that lasted five to ten minutes. *Id.* ¶¶ 85, 89.

The parties have somewhat different accounts of Cochran's second visit. Defendant states that Cochran expressed concern to Phyllis about the lack of adequate storage space at the store. *Id.* ¶ 90.[1] Although she acknowledges that the Bookstore is small in relation to the amount

---

[1]      Cochran described the comment as follows at his deposition:

Q:      Do you recall saying that "The store is small, but you must have gotten the job done, because there are no complaints from the school" at any time to Phyllis Sibilla?

A:      No.

Q:      Do you recall saying to Nancy Sibilla at any time that "The store is small but you must have gotten the job done, because there are no complaints from the school"?

of sales transactions, Phyllis interpreted this comment as being directed at her appearance, specifically her large size. Pls.' 56.1 ¶ 304. Plaintiffs also state that Cochran was "dismissive" at this meeting. *Id.* ¶¶ 304-306 (citing June 8, 2001 Affidavit of Phyllis Sibilla [DE 29] ("P. Sibilla Aff.") ¶¶ 26-27; June 8, 2011 Affidavit of Nancy Sibilla [DE 28] ("N. Sibilla Aff.") ¶ 39).

On June 16, 2009, Follett gave a presentation to all SCCC bookstore employees at the Ammerman Campus after which the Barnes & Noble employees who were interested in working for Follett were interviewed individually. Def.'s 56.1 ¶¶ 93, 94. Nancy's application indicates that she applied for the position of Store Manager. *See* N. Sibilla Aff., Ex. I. Phyllis' application indicates that she applied for the position of Assistant Manager. *See* P. Sibilla Aff., Exh. R.

### C.     The Interviews

Along with other interested Barnes & Noble employees, both Plaintiffs were interviewed at the Ammerman Campus pursuant to Follet's standard format pre-printed interview template. Def.'s 56.1 ¶¶ 94-97.

### 1.     Phyllis Sibilla's Interview

Phyllis Sibilla was interviewed by Follett Human Resources Manager, Jeanne Bosbach ("Bosbach"). *Id.* ¶ 111. During the interview, Bosbach told Phyllis that due to Follett's anti-nepotism policy, she would not able to work for her sister and asked if Phyllis would be willing to relocate to another campus. *Id.* ¶¶ 118-21. Phyllis responded that she wanted to work at the

---

A:     No. I remember talking about the size of the space. I do remember
        the space is small. But nothing about getting the job done or
        complaints.

June 14, 2011 Declaration of David G. Gabor [DE 31] ("Gabor Decl."), Ex. GG at 36.

4

Grant Campus location and said nothing to suggest she was willing to work at another store.  *Id*. ¶ 121.

Citing Bosbach's deposition transcript, Defendant states that Phyllis's interview left Bosbach with the impression that Phyllis mainly performed non-managerial accounting duties which would no longer be necessary at the Grant Campus given Follett's organizational structure. *Id*. ¶¶ 123-34.  Plaintiffs dispute Defendant's characterization of Bosbach's impression and refer to Phyllis Sibilla's affidavit as evidence that Bosbach's account was inaccurate.  *See* Pls.' 56.1 ¶¶ 123-32.

The parties agree that Phyllis told her sister Nancy that she did not think the interview went well and that she described the interview as "horrible" in her deposition.  *See* Def's. 56.1 ¶¶ 113-15 (citing Transcript of January 19, 2011 Deposition of Phyllis Sibilla ("P. Sibilla Tr.") at 202-203, Ex. A to May 3, 2011 Declaration of Laura Sack in Support of Defendants' Motion for Summary Judgment [DE 26] ("Sack Decl."); Pl's 56.1 ¶¶ 113, 115).  In Plaintiffs' Rule 56.1 Counterstatement, Plaintiffs state that Phyllis thought the interview as horrible "based upon the offer that Phyllis received."  Pls.' 56.1 ¶ 113 (citing P. Sibilla Aff. ¶ 32).

### 2.  Nancy Sibilla's Interview

Nancy Sibilla was interviewed by Follett Human Resources Recruiter Amantha Nyberg. Def.'s 56.1 ¶¶ 103, 137.  In Nyberg's opinion, Nancy did not interview well and focused on the textbook and text management aspects of the position.  *Id*. ¶¶ 138-145.  Plaintiffs dispute some of Nyberg's characterization of the interview.  Pls.' 56.1 ¶¶ 138-145.  Nyberg concluded that Nancy was not qualified for the Store Manager position based on her interview, a representation that Plaintiffs do not dispute.  Def.'s 56.1 ¶ 198.  Nyberg's notes from Nancy's interview state

5

that Nancy lives near the "larger store," i.e., the Ammerman Campus store, *id*. ¶ 147, but Nancy disputes that she said this. Pls.' 56.1 ¶ 147.

### D. Follett's Offers to Plaintiffs and Other Barnes & Noble Employees

After their interviews, Nancy Sibilla was offered the position of Text Manager at the Ammerman Campus at a salary of $30,000 with eligibility to receive a bonus of up to 30% of her base salary. Def.'s 56.1 ¶ 191. Phyllis Sibilla was offered the position of full-time Cashier at the Grant Campus at an hourly rate of $9.30 per hour. *Id*. ¶ 178. These positions paid less than Plaintiffs were previously making. In their Rule 56.1 Counterstatement (which Defendant did not respond to), Plaintiffs state that they considered these positions to be demotions and that at the time of their interviews with Follett, Nancy was making $48,000 per year and Phyllis was earning $16.69 per hour. Pl's. 56.1 ¶¶ 333-34, 337-39. The positions Plaintiffs desired – Store Manager and Assistant Manger at the Grant Campus – were offered to Ben Surbeck and Mark Yetman respectively. Def.'s 56.1 ¶¶ 164, 256. At the time of his offer, Yetman was employed by Follett at another campus. *Id*. ¶¶ 164-65. Surbeck also had prior experience at Follett. *Id*. ¶ 256.

Follett's organizational structure is different from that of Barnes & Noble. *Id*. ¶¶ 155-57. At Follett, the Text Manager handles textbook ordering, a task performed by the Store Manager at Barnes & Noble. *Id*. ¶ 156. Another difference is that at Follett, the accounting and bookkeeping functions are not handled in-store as they are at Barnes & Noble. *Id*. ¶ 157. Follett did not seek references from Barnes & Noble for the SCCC applicants because Barnes & Noble was its competitor. *Id*. ¶ 152. Follett's explanation for offering the Text Manager position to Nancy is that she explained in her interview that 80% of her duties in her previous role with

Barnes & Noble were text-related and the job duties of the Text Manager position at Follett were consistent with the strengths and passions expressed by Nancy at her interview.  Def.'s 56.1 ¶¶ 47, 192-96.  Plaintiffs dispute that this was the reason Nancy was offered the position.  Pls.' 56.1 ¶ 192.  Notably, there is no Store Manager position at the Ammerman Campus because the Store Director, who is responsible for overseeing all three SCCC Bookstores, is based out of Ammerman.  Def.'s 56.1 ¶¶ 162-63.  The Store Director position was offered to a current Follett employee, Melissa White, a "heavyset" woman.  *Id.*  ¶¶ 160-62.[2]

Unlike Plaintiffs, certain other Barnes & Noble employees working at SCCC received offers for positions similar to or better than their previous positions at Barnes & Noble.  For example, Rennee Phelps, Store Manager at the Riverhead Campus bookstore, was offered a Store Manager position at a pay rate of $38,000 per year.  *Id.*  ¶¶ 32, 167.  Lori Arhangelsky, the former Assistant Manager of the Ammerman Campus bookstore received an offer of Assistant Store Manager at a pay rate of $42,500 per year.  *Id.*  ¶¶ 29, 252; Gabor Decl., Ex. Z.  Robin Karlsen, a former cashier at the Riverhead Campus bookstore received an offer for an Assistant Store Manager position at a pay rate of $10.50 per hour.  Def.'s 56.1 ¶ 251; Pls.' 56.1 ¶ 345.

---

[2]     At oral argument, counsel for Plaintiffs appeared to dispute whether Ms. White was heavyset.  Regarding Ms. White, counsel stated:

> I have no knowledge of her.  I don't know if Nancy or Phyllis ever
> met her or know what she looked like or anything of that nature.  I
> don't have a picture of her.  I don't know how much she weighs.

Transcript of Dec. 7, 2011 Oral Argument ("Oral Arg. Tr.") at 26.  Plaintiffs, however, did not contest the statement, supported by admissible evidence, in Defendant's Rule 56.1 Statement that "Melissa White, the [Follett] employee chosen for this position is heavyset."  *See* Def.'s 56.1 ¶ 163; Pls.' 56.1 ¶ 163.  Thus, the Court must accept that Ms. White was "heavyset."

Rosemary Conetta, a former Grant Campus employee, received an offer that she considered to be a demotion, similar to the Plaintiffs.  Def.'s 56.1 ¶¶ 174-76.

### E.    Plaintiffs' Rejection of Their Offers

Although Plaintiffs initially accepted the offers Follett made to them, they ultimately changed their minds and decided not to work for Follett prior to the transition of the Bookstore from Barnes & Noble to Follett.  *See id.* ¶ 213.  Plaintiffs informed Follett that they were rejecting their offers on July 14, 2009, the day of the transition of the Bookstore from Barnes & Noble to Follett.  *Id.* ¶ 216.  On that day, Plaintiffs handed Cochran their resignation letters, along with the letters of three or four other Grant Campus employees and Follett learned that none of the Grant Campus employees would be reporting to work for Follett.  *Id.* ¶¶ 217, 227.

## III.   STANDARD OF REVIEW

### A.    Summary Judgment Standard

Fed. R. Civ. P. 56(a) dictates that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the initial burden of establishing the absence of any genuine issue of material fact.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  To determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that evidence in the light most favorable to the non-moving party.  *Doro v. Sheet Metal Workers' Int'l Ass'n,* 498 F.3d 152, 155 (2d Cir. 2007); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005).

8

Where the movant shows a prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id.*; *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("Even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor"). Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Dobbs v. Dobbs*, No. 06-CV-6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) ("The Court's goal should be to isolate and dispose of factually unsupported claims") (internal quotation marks omitted).

With respect to employment discrimination cases, the Second Circuit advised that trial courts should "be cautious about granting summary judgment to an employer when . . . its intent is in issue," and "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo v. Prudential Residential Servs., Ltd. P'Ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). Summary judgment is, however, "appropriate even in discrimination cases for . . . the salutory purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to other areas of litigation." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

9

### B.     Employment Discrimination Framework

Title VII prohibits an employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The ADEA, 29 U.S.C. § 621 *et seq.*, and the ADA, 42 U.S.C. § 12101 *et seq.*, similarly prohibit discrimination because of an individual's age or disability respectively.  The state law counterpart of these statutes is the New York State Human Rights Law which prohibits unlawful discrimination "because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status. . . . ."  N.Y. Exec. Law § 296(1)(a).

Claims brought under all of the statutes discussed above are assessed under the framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817 (1973).  Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination by showing that: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination."  *Weinstock*, 224 F.3d at 42.  Once the plaintiff has established a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action.  *Id.* "The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S. Ct. 2742 (1993) (internal quotation marks omitted; emphasis in

original).  "Upon the defendant's articulation of such a non-discriminatory reason for the employment action, the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture."  *Weinstock*, 224 F.3d at 42.  In order for the case to continue, the plaintiff must come forward with evidence that the defendant's proffered, non-discriminatory reason is a pretext for actual discrimination.  *Id*.  The plaintiff must demonstrate by a preponderance of the evidence that the articulated reason is untrue *and* that discrimination was the real reason for the employment action taken.  *Id*.  With these principles in mind, the Court now turns to the fact-specific circumstances of the instant case.

## IV.   DISCUSSION

### A.   Prima Facie Case of Discrimination

#### 1.   Membership in a Protected Class

The only claims for which Plaintiffs' membership in a protected class is contested are Plaintiffs' disability claims.  The ADA and its NYSHRL counterpart protect both individuals who are disabled, as well as individuals who may not actually be disabled, but who are regarded as being disabled by their employer.  *See* 42 U.S.C. § 12102(1); N.Y. Exec. Law §§ 292(21). Although the Complaint contains allegations that Plaintiffs are actually disabled, *see* Compl. ¶¶ 94, 102, 138, 146, Plaintiffs' counsel confirmed at oral argument that Plaintiffs have abandoned this theory and are proceeding solely on a "regarded as" theory.  *See* Oral Arg. Tr. at 27.[3]

---

[3]      The exchange was as follows:

> COURT:      As I was reading through all the materials, it looked to me as if [Plaintiffs'] claim of being disabled, is somewhat abandoned, but the "regarded as" prong is really what you're going after

11

### a.   Federal Law Claim

The ADA Amendments Act of 2008 ("ADAAA"), which became effective on January 1, 2009, Pub. L. No. 110-325, § 8, 122 Stat. 3553, expanded the definition of a disability under the ADA. *See* 42 U.S.C. § 12102.  In *Milholland v. Sumner County Board of Education.*, the Sixth Circuit described the amendments as follows:

> Before January 1, 2009, the ADA defined a disability as:
>
> > (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> >
> > (B) a record of such an impairment; or
> >
> > (C) being regarded as having such an impairment.
>
> 42 U.S.C. § 12102(2) (2006). Under this definition, the impairment that a plaintiff was "regarded as having" under subpart (C) was an impairment as defined in subpart (A). In turn, under subpart (A), to limit the major life activity of working, a plaintiff had to show that she was regarded as having an impairment that substantially limited her life activity of working in the same "broad class of jobs." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).
>
> The amended version of the ADA no longer requires the plaintiff bringing a claim under subpart (C) to show that the impairment limited her life activity, including working in a broad class of jobs.
>
> The ADA now defines a disability as:

---

here.

ATTY.:              That's correct, Your Honor.

COURT:          Is that accurate?

ATTY.:              That's correct.

12

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C.A. § 12102(1) (2009) (added language italicized).

Paragraph (3) states that

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

*Id*. § 12102(3)(A). Congress enacted the ADA Amendments Act in order to "reinstat[e] a broad scope of protection to be available under the ADA," and to overrule *Sutton*. Pub.L. No. 110-325, § 2, 122 Stat. 3553, 3554.

569 F.3d 562, 565-566 (6th Cir. 2009).

Prior to the enactment of the ADAAA, Plaintiffs' "regarded as" claims would have been readily dismissed on the grounds that Plaintiffs failed to identify a broad class of jobs that they were perceived as being restricted in their ability to perform. *See, e.g., Sutton v. United Air Airlines, Inc.*, 527 U.S. 471, 491, 119 S. Ct. 2139 (1999); *Capobianco*, 422 F.3d at 57; *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 153 (2d Cir. 1998); *Caronia v. Hustedt Chevrolet*, No.05-CV-3526, 2009 WL 909729, at *9 (E.D.N.Y. April 1, 2009) (noting that ADAAA did not apply retroactively). Even under the new, broader "regarded as" definition, Plaintiffs' claims still fail since there is no evidence in the record suggesting that Follett perceived the Sibillas as having an impairment.

13

In considering this issue, the Court notes at the outset Plaintiffs' description/perception of what happened to them when Follett won the bid for the contract with the SCCC Bookstore and they did not receive the positions they expected:

> Nancy and Phyllis Sibilla were experienced managers with a longstanding history of successfully running a busy bookstore at SCCC. Despite that, when Follett assumed the right to operate the bookstores they did not see women who were competent in their trade. Instead, they saw two (2) older, obese women and decided that they could not possibly work as either a bookstore manager or assistant manager. Follett concluded and broadcasted that the work must have been done by another manager. There was no way that Nancy or Phyllis could possibly do this work.

Pls.' Mem. at 18. Plaintiffs characterize this conduct as "gender plus" discrimination without citation to any supporting references in depositions, affidavits or documents. Rather, Plaintiffs draw this conclusion relying on the principle of longevity and satisfactorily meeting Barnes & Noble standards rather than on any criteria established by Follett which Follett used in its bookstore operations across the country. Def.'s 56.1 ¶ 11.

Plaintiffs do not explain what aspects of the job Follett purportedly thought they could not perform. Nor do Plaintiffs point to any evidence to substantiate their claim that Follett believed they were unable to perform. *C.f. Frank v. Lawrence Union Free Sch. Dist.*, 688 F. Supp. 2d 160, 171 (E.D.N.Y. 2010) (holding that employer regarded employee as disabled based on employer's comments suggesting a belief that the employee's weight was disabling); *Branson v. Ethan Allen, Inc.*, No. 02-CV-6588, 2004 WL 2468610, at *4 (E.D.N.Y. Nov. 3, 2004) (same).

Viewing the facts in the light most favorable to Plaintiffs, the only evidence the Sibillas point to in order to demonstrate that Follett regarded them as disabled are the following statements:

14

- On June 8, 2009, T.J. Cochran, Follet's Regional manager, came by the bookstore unexpectedly to drop off applications while on his way to a faculty meeting. Cochran did not treat [Phyllis] well. Instead, he was cold and distant. [Phyllis does] recall that he asked [her] how [she and Nancy] managed to work in such a small space. P. Sibilla Aff. ¶ 25.

- While the size of the bookstore is small in relation to the amount of sales transactions, [Phyllis] took this as a discriminatory comment toward [her] appearance. P. Sibilla Aff. ¶ 26.

- [Phyllis does] not believe that Bosbach gave [her] an objective interview. Instead, [Phyllis] thinks that she focused on her weight and assumed that [she] was lazy. P. Sibilla Aff. ¶ 40.

- Bosbach told [Phyllis] that [she] did not do any work at the bookstore implying that [she] was a lazy person and a liar. P. Sibilla Aff. ¶ 45.

- [Nancy] believe[s] that the defendant viewed [her] in a negative light based upon a combination of weight, gender and age. N. Sibilla Aff. ¶ 56.

These facts do not demonstrate that Follett regarded Plaintiffs as disabled. Statements such as "Phyllis thinks . . ." and "Nancy believes . . ." are insufficient to defeat a motion for summary judgment since they are not supported by evidence and merely reflect the Plaintiffs' subjective beliefs. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 456 (2d Cir. 1999) (holding that an employee's feelings and perceptions of being discriminated against are not evidence of discrimination). Putting aside these statements, what is left is Cochran's comment regarding the size of the Bookstore and Bosbach's statement that Phyllis did not do any work. These statements cannot reasonably be interpreted as referring to the Plaintiffs' obesity. The Court finds significant the following testimony on the size of the Bookstore given by Travis Cochran during his deposition:

> Q: Now let's talk about Nancy Sibilla first. Can you tell us about every interaction you had with Nancy starting with the first one to the most recent?

A:      Interaction.  Obviously the first time I interacted, I dropped
        off the application.  I don't remember specifically the date.

        But when I did meet her, it was just an introduction.  Hi.  I'm
        TJ, the Regional Manager, and just to introduce myself and
        make sure they had the applications.

Q:       On that occasion did you talk to her at all about the operation
        of the store?

A:      I asked a couple of questions.  I was amazed by how small the
        bookstore space was.  This was the first time I had actually
        seen it.  And how many students they have at Grant Campus.
        I was surprised that they would be able to get all of the
        students inside the store and be able to service them all.

        So I asked about, How long are the lines?  How many
        registers do you run?  How many students are on financial
        aid?  Are there any other facilities other than just the
        bookstore that you use?

Q:      Was she able to answer all those questions?

A:      Yes.

Gabor Decl., Ex. FF at 71-72.

    Although this answer appears to provide a reasonable response on the "size" issue

concerning the Bookstore, it is a different perception from that of Plaintiff Phyllis Sibilla.  Even

accepting Phyllis's version, it is clear that under existing case law, stray remarks such as the one

made by Cochran are insufficient to withstand summary judgment.  Likewise the inference

Phyllis draws from the Bosbach interview is not a factually reasonable one – in one statement,

Phyllis says that Bosbach assumed she was lazy and had no reason to believe Phyllis spent the

majority of her time performing accounting functions (¶ 40).  In another statement, Phyllis cites

her previous hourly rate at Barnes & Noble as an asserted defense to the "laziness" charge (¶ 46).

*See Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 56 (2d Cir.1998) ("[S]tray remarks, even if made by a decision maker, do not constitute sufficient evidence to make out a case of employment discrimination."); *Kantrowitz v. Uniondale Union Free Sch. Dist.*, – F. Supp. 2d –, No. 08-CV-3592, 2011 WL 4593147, at *15 (E.D.N.Y. Sept. 30, 2011) (holding that isolated comments in which individuals apologized to plaintiff for making her walk up stairs were insufficient to defeat summary judgment on disability discrimination claim); *Pace v. Paris Maintenance Co.*, 107 F. Supp. 2d 251, 263 (S.D.N.Y. 2000) (holding that stray remark regarding the plaintiff's drinking problem was insufficient to show the defendants perceived the plaintiff as disabled).

Finally, even if Plaintiffs could prove that Follett regarded them as obese or overweight, it does not necessarily follow that Follett regarded them as having an impairment.  In *Francis v. City of Meriden*, 129 F.3d 281, 287 (2d Cir. 1997), the Second Circuit explained that it would be inconsistent with the purposes of the ADA to construe the statute to "reach alleged discrimination by an employer on the basis of a simple physical characteristic, such as weight." To do so would render the disability discrimination laws "a catch-all cause of action for discrimination based on appearance, size, and any number of things far removed from the reasons the statutes were passed."  *Id*.  For this reason, the court in *Francis* dismissed a "regarded as" claim where the plaintiff alleged only that the employer regarded him as not meeting a weight standard, but did not regard him as suffering a physiological weight-related disorder.  *Id.*  This reasoning remains applicable even after the passage of the ADAAA.  The fact that an employer regards an employee as obese or overweight does not necessarily mean that the employer regards the employee as suffering a physical impairment.  Indeed, the Court notes that the fact that Follett

17

offered Nancy Sibilla a position that required her to lift certain weights and to climb ladders –
tasks Nancy now claims she is unable to perform due to "her health and her weight," Pls.' 56.1
¶¶ 336 – 371, undermines Plaintiffs' assertion that Defendant viewed her as disabled.

In sum, Plaintiffs have not demonstrated that Defendant regarded them as disabled within
the meaning of the ADA and, therefore, Plaintiffs have not established membership in a
protected class in connection with their disability claim.

### b.   State Law Claim[4]

As with the ADA claim, Plaintiffs cannot demonstrate membership in a protected class
under the NYSHRL.  In order to prove that an employee has a disability within the meaning of
the NYSHRL, an employee must show that the employer "(1) regarded her as having an
impairment that either prevented the exercise of normal bodily function or is demonstrable by
medically accepted techniques or (2) mistakenly believed that plaintiff's condition was a physical
impairment that either prevented the exercise of a normal bodily function or was demonstrable by

---

[4]      The court is cognizant of the fact that federal courts sometimes decline to exercise
supplemental jurisdiction over state law disability discrimination claims after finding that the
federal law claims do not survive summary judgment.  *See, e.g., Levine v. Smithtown Cent. Sch.
Dist.*, 565 F. Supp. 2d 407, 428 (E.D.N.Y. 2008); *Almond v. Westchester County Dep't of Corr.*,
425 F. Supp. 2d 394, 401-02 (S.D.N.Y. 2006).  In declining to exercise supplemental
jurisdiction, courts often point to the lack of congruency between the state and federal claims
given the broader definition of disability under the NYSHRL.  However, the new, expanded
definition of disability set forth in the ADAAA ameliorates this concern.  Moreover, the Court
notes that the exercise of supplemental jurisdiction may not even be necessary here.  Although
Plaintiffs allege that this Court's jurisdiction is based on federal question jurisdiction, *see* Compl.
¶ 5, there is an allegation that Defendant's principal offices are in Illinois, *id.* ¶ 3, and, thus, it is
possible that the Court has diversity jurisdiction over this case.  Moreover, Defendant does not
urge the Court to decline jurisdiction.  For all these reasons, the Court finds it appropriate to
address the NYSHRL claims on the merits.

medically accepted evidence." *See Caronia*, 2009 WL 909729, at *10 (citing *Branson*, 2004 WL 246810, at *4 (internal alteration omitted)). For the same reasons that Plaintiffs cannot demonstrate that they were regarded as having a disability for purposes of their ADA claim, Plaintiffs cannot demonstrate that Defendant regarded them as having or mistakenly believed they had a physical impairment for purposes of their NYHRL claim.

### 2.    Qualifications of Plaintiffs for Their Positions

Defendant concluded, based upon Plaintiffs' interviews with Follett's representatives, that they were not qualified for the Store Manager and Assistant Manager positions which Plaintiffs sought. Def.'s Mem. at 9-10. Amantha Nyberg, Follett's Human Resources Recruiter, testified that based on Follett's job descriptions, she and the Follett management team handling the transition from Barnes & Noble did not believe that Nancy Sibilla was a qualified candidate for the Store Manager position. Def.'s 56.1 ¶ 199; Transcript of the Feb. 16, 2011 Deposition of Amantha Nyberg, Ex. F to the Sack Decl. ("Nyberg Tr.") at 108. According to Nyberg, she, Bosbach and Cochran reached this decision "[b]ased on what we as Follett managers do. It is based on what Follett expectations and job description is, not what the person had been doing prior." Nyberg Tr. at 108; Def.'s 56.1 ¶ 200. Plaintiffs stated that they do not contest these allegations in their Rule 56.1 Statement. Pls.' 56.1 ¶¶ 199, 200. Defendant does not specifically delineate which functions of the positions Plaintiffs were unable to perform. Defendant asserts that in deciding how to staff the three bookstores at SCCC, Follett followed its standard procedures for staffing stores that had previously been operated by another company. Def.'s 56.1 ¶ 95; Transcript of the Feb. 25, 2011 Deposition of Jeanne Bosbach, Ex. G to the Sack Decl. ("Bosbach Tr.") at 25. Initially, all Barnes & Noble employees were encouraged to submit

19

applications for employment to Follett.  Def.'s Mem. at 13.  Follett then interviewed each applicant and, "based solely on these interviews, [Defendant] determined which [Follett] position best suited the skills each candidate demonstrated at his or her interview."  *Id*.  According to Follett, the candidate's performance at the interview was the primary factor in the decision to extend a job offer.  *Id*. ¶ 152.  The Plaintiffs completely disagree with this premise.  Pls.' 56.1 ¶ 152.  Ultimately, according to the Defendant, in assessing "qualifications," Follett offered positions based on (i) the candidate's "interview with [Follett]; (ii) [Follett's] anti-nepotism policy . . . and (iii) the geographic preferences Plaintiffs expressed at their interviews."  Def.'s Mem. at 13.

In order to satisfy the second prong of the *prima facie* case, "all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer."  *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001).  The Second Circuit has repeatedly held that "the qualifications necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he 'possesses the basic skills necessary for performance of the job.'"  *Id.* (quoting *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 (2d Cir. 1991)) (internal alteration omitted); *accord Vernon v. Port Auth. of New York and New Jersey*, 154 F. Supp. 2d 844, 856-57 (S.D.N.Y. 2001); *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 350 (S.D.N.Y. 2006); *Ghosh v. New York City Dep't of Health*, 413 F. Supp. 2d 322, 333 (S.D.N.Y. 2006).  The qualifications should be judged with respect to the employer's criteria, not standards that may seem reasonable to a jury or a judge.  *See Thornley v. Penton Publ'g*, 104 F.3d 26, 29 (2d Cir. 1997).

The factual record is far from clear on this point.  The job description of the Follett Store Manager position enumerates specific requirements, such as an Associate's degree, retail supervisory or management experience, basic accounting/bookkeeping skills, etc.  *See* Decl. of Laura Sack in Further Support of Defendant's Motion for Summary Judgment [DE 35], Ex. B. Although it is not part of the record, the Court assumes that there was a similarly detailed job description for the Follett Assistant Store Manager position.  Notwithstanding the fact that the Defendant has not demonstrated, or even articulated, which specific requirement(s) of the positions Plaintiffs failed to satisfy, Plaintiffs, for their part, have not demonstrated that they satisfied the requirements.

At this stage, the Court must view the evidence in the light most favorable to the non-moving party.  The Court cannot conclude at this point that Plaintiffs did not meet the minimal threshold of possessing the basic skills necessary for the positions of Store Manager and Assistant Manager, albeit thinly.  The one case cited by Defendant in support of its argument, *Gambello v. Time Warner Communications, Inc.*, 168 F. Supp. 2d 209 (E.D.N.Y. 2002), is inapposite.  In that case, the Court found that the plaintiff was not qualified for a position that had an increased focus on sales where the plaintiff had a track record of poor sales performance with the company.  *Id*. at 221.  Here, Defendant has not identified a particular qualification that Plaintiffs did not possess.  Ultimately, however, this issue is somewhat moot because, as discussed *infra*, Plaintiffs cannot prove discriminatory conduct and, on that basis, Defendant was not obligated to hire Plaintiffs for the positions they sought even if they met the minimum qualifications.

### 3.    Adverse Employment Action

The Complaint contains several allegations regarding adverse employment actions. Plaintiffs allege that as a result of their gender, Defendant refused to fairly consider them for the position they previously held, demoted them, and then falsely claimed that they underperformed. Compl. ¶¶ 78, 86, 122, 130.  With respect to their age discrimination claim, Plaintiffs allege that Defendant demoted them, badmouthed them and treated them in a disparate manner.  *Id.* ¶¶ 109, 115, 153, 159.  In connection with all of their claims, Plaintiffs alleges that they were constructively discharged from their positions with Defendant.  *Id.* ¶¶ 80, 88, 98, 106, 110, 116, 124, 132, 142, 150, 154, 160.

Plaintiffs' constructive discharge theory is premised on their claim that (1) Follett offered the Sibillas positions they knew the Sibillas would not like, knowing that they would reject such offers and (2) Follett falsely claimed that the Sibillas underperformed and "badmouth[ed]" the Plaintiffs prior to their start date with Follett.  Pls.' Mem. at 25.  Plaintiffs also argue that Nancy was constructively discharged because Follett offered her a position that required her to do work that she could not possibly perform "such as standing for extended periods of time, lifting and climbing."  Pls.' Mem. at 25.

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily."  *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996).  "Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  *Id.* (internal quotation marks and citation omitted).

22

The constructive discharge theory of adverse employment action is a non-starter here because Plaintiffs never actually worked for Follett.  Consequently, they could not have been subject to such an intolerable work environment that they felt compelled to resign.  To support their argument that a constructive discharge theory is viable, Plaintiffs rely on *Pennsylvania State Police v. Suders*, 542 U.S. 129, 124 S. Ct. 2342 (2004).  In that case, which involved factually distinguishable sexual harassment claims, the court described the constructive discharge inquiry as follows: "Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"  *Id.* at 141.  The parties here do not dispute that Plaintiffs rejected their offers prior to commencing work at Follett.  *See* Pls.' 56.1 ¶¶ 213-216.  Thus, Plaintiffs cannot claim that the working conditions at Follett were so intolerable that they were compelled to resign since they did not work a single day at Follett.  Plaintiffs are therefore precluded from relying on a constructive discharge theory as a matter of law.[5]

In addition to the constructive discharge theory, Plaintiffs assert that Follett's refusal to consider them for the positions they previously held and their so-called "demotion" also constitute adverse employment actions.  Strictly speaking, Plaintiffs' characterization of Follett's

---

[5]      Plaintiffs' argument that Nancy was constructively discharged because as Text Manager she would have had to stand for extended periods of time, lift, and climb is flawed for additional reasons.  First, there is no evidentiary support for the statement that Nancy was unable to stand for long periods of time.  While Nancy's Affidavit states that she was unable to lift heavy weights and climb ladders, she apparently had no problem standing for long periods of time.  *See* N. Sibilla Aff. ¶ 54.  Moreover, the Follett job description for the Store Manager position – the position Nancy desired – also required her to "lift up to or more than 50 pounds."  *See* Sack Reply Decl., Ex. B.  It is also noted that the Barnes & Noble Store Manager job description submitted by Nancy required the employee to be able to stand for up to 8 hours and lift up to 70 pounds.  *See* N. Sibilla Aff., Ex. F.

23

action as a "demotion" is inaccurate since Plaintiffs did not previously work for Follett and therefore could not be demoted. The Court does find, however, that the record contains sufficient evidence to support a failure to hire theory of adverse employment action. Nancy applied for the position of Store Manager, *see* N. Sibilla Aff., Ex. I, but was not hired for that position. Similarly, Phyllis applied for the position of Assistant Manager, *see* P. Sibilla Aff., Exh. R, but was not hired for that position. The refusal to hire Plaintiffs for the positions they applied for can be construed as an adverse employment action. *See Ghosh*, 413 F. Supp. 2d at 332; *Coger v. Conn.*, 309 F. Supp. 2d 274, 284 (D. Conn. 2004).

This case is distinguishable from situations where a plaintiff sought, and was denied, a position that involved the same salary, benefits, opportunities for promotion, etc., and where the courts have held, as a result, that there is no adverse employment action. *See Watson v. Paulson*, 578 F. Supp. 2d 554, 564 (S.D.N.Y. 2008) (holding that transfer to position with same pay, grade, and duties was not an adverse employment action); *Neitzke v. Husqvarna Prof'l Outdoor Prods., Inc.*, 529 F. Supp. 2d 1022, 1028 (D. Neb. 2008) (holding that there was no adverse employment action where position plaintiff was offered had the same salary, title, duties and benefits as position she sought). Given that Plaintiffs were offered lower-paying, lower-ranking positions than the ones they applied for, they suffered an adverse employment action. *See Ganthier v. North Shore-Long Island Jewish Health Sys., Inc.*, 345 F. Supp. 2d 271, 275-76 (E.D.N.Y. 2004) (assuming that the failure to hire the plaintiff for the position she sought was an adverse employment action even though she was offered a different position). Therefore, Plaintiffs have satisfied this element of the prima facie case.

24

### 4.   Circumstances Giving Rise to an Inference of Discrimination

One way to demonstrate circumstances giving rise to an inference of discrimination is to show that other, similarly situated persons, not of Plaintiffs' protected class, were treated more favorably than Plaintiffs. *Hill*, 467 F. Supp. 2d at 356.  The position Nancy sought, namely, Store Manager, was offered to Ben Surbeck, an individual who had experience working at a Follett bookstore.  Def.'s 56.1 ¶ 256.  The Assistant Manager position that Phyllis sought was offered to Mark Yetman, also a Follett employee working at another college bookstore.  *Id*. ¶ 164.  These individuals are not similarly situated to Plaintiffs in light of their experience with Follett and Plaintiffs do not identify them as comparators.  Instead, Plaintiffs compare themselves to other former Barnes & Noble managers at SCCC who were treated more favorably than Plaintiffs in that they received the same position or better positions with Follett in the transition than they had at Barnes & Noble.  Pls.' Mem. at 20.

The problem with Plaintiffs' theory is that the employees who purportedly received favorable treatment were also members of Plaintiffs' protected class.  Specifically, Rennee Phelps, the former Store Manager at the Riverhead Campus Book Store was offered a Store Manager position at a pay rate of $38,000 per year.  Def.'s 56.1 ¶¶ 32, 167.  Phelps was fifty-one (51) years old in 2009.  *Id*. ¶ 168.  Lori Arhangelsky, the former Assistant Manager of the Ammerman bookstore, received an offer for an Assistant Store Manager position at a pay rate of $40,000 per year.  *Id*. ¶¶ 29, 252; Gabor Decl., Ex. Z.  Robin Karlsen, the former cashier at the Riverhead Campus Book Store, received an offer for an Assistant Store Manager position at a

pay rate of $10.50 per hour.  *Id.* ¶ 251; Pls.' 56.1 ¶ 345.[6]  Plaintiffs also assert that all three of these women worked for Barnes & Noble for considerably less time than the Sibillas.  The fact that these individuals received more favorable treatment than Plaintiffs does not raise an inference of discrimination because all of these individuals were women and one of them was age-protected.[7]  *See Lu v. Chase Inv. Servs. Corp.*, No. 10-CV-208, 412 Fed. Appx. 413, 418 (2d Cir. 2011) (noting that plaintiff was unlikely to satisfy *prima facie* case in race and national origin discrimination case where the two comparators were of the same ethnicity as plaintiff and one was of the same national origin as plaintiff).  It is also noteworthy that Follett offered the most senior position available at the SCCC bookstores, namely, Store Director, to a woman, Def.'s 56.1 ¶¶ 160-63, and that Robin Karlsen, was offered a pay rate of $.50 per hour more than her male counterpart, the Assistant Manager at the Grant Campus, Mark Yetman, *see id*. ¶¶ 164, 251.

Although all of the comparators Plaintiffs point to are women, Plaintiffs nonetheless argue that their gender discrimination claim can go forward because Follett's actions reflect bias against a narrow class of women, namely, obese women.  In support of this argument, Plaintiffs rely on *Back v. Hastings on Hudson Union Free School District*, 365 F.3d 107 (2d Cir. 2004) in which the Second Circuit discussed a claim of discrimination against a sub-class of women.  Referring to the theory as "gender plus," the court allowed plaintiff's claim to go forward where there was evidence that her employer relied on stereotypical characteristics associated – not with

---

[6]    Robin was technically not similarly situated to Plaintiffs since she did not hold a management position at Barnes & Noble prior to the transition. Pls.' 56.1 ¶¶ 344-46.

[7]    Plaintiffs have not demonstrated that they are disability-protected, thus the Court does not discuss whether there are circumstances giving rise to an inference of disability discrimination.

*all* women – but with mothers specifically.  *Id*. at 117-22; *see also Price Waterhouse v. Hopkins*,

490 U.S. 228, 109 S. Ct. 1775 (1989) (involving claim based on stereotyped images of women).

In explaining why the conduct at issue constituted a "gender-based stereotype," the court in *Back*

stated:

> Just as "[i]t takes no special training to discern sex stereotyping in a description of an aggressive female employee as requiring 'a course at charm school,'" *Price Waterhouse*, 490 U.S. at 256, 109 S.Ct. 1775, so it takes no special training to discern stereotyping in the view that a woman cannot "be a good mother" and have a job that requires long hours, or in the statement that a mother who received tenure "would not show the same level of commitment [she] had shown because [she] had little ones at home."

365 F.3d at 120 (alterations in original).  Plaintiffs attempt to stretch this logic by arguing that

"[i]t stands to reason that it requires no special training to make the leap that a woman who is

obese is likely to be lazy, unproductive and suffer an increased likelihood of health challenges."

Pls.' Mem. at 19.  This attempt is unavailing.  The problem with this argument is that, unlike the

stereotypes described in *Back* and *Price Waterhouse*, there is no similar stereotype that women

are obese (or not obese).  Plaintiffs provide no case law to support their theory that the "plus" in

a gender plus case can be some factor unrelated to the stereotypes associated with the protected

class.  Under Plaintiffs' theory, any sub-class of women, i.e., women who drive blue cars or

women who live in a certain town, are a protected class who may be singled out for comparison.

Such a result is not what the courts in *Back* and *Price Waterhouse* intended.[8]

---

[8]     The Court's independent research did not reveal any cases in the Second Circuit in which a plaintiff successfully brought a case based on a "gender plus obesity" or "gender plus weight" theory.  When asked to identify any such cases at oral argument, counsel for Plaintiffs cited the following cases:  *Lowe v. American Eurocopter, LLC*, No. 10-CV-24, 2010 WL 5232523 (N.D. Miss. Dec. 16, 2010); *Hayes v. Wal-Mart Stores, Inc.*, 781 F. Supp. 2d 1080 (D. Or. 2011); and *Cook v. State of Rhode Island, Department of Mental Health, Retardation ,and Hospitals*, 10

Plaintiffs cannot satisfy the inference of discrimination element by identifying similarly situated persons, not of Plaintiffs' protected class, who were treated more favorably than they were.  Another way to satisfy this element is through direct or circumstantial evidence of discrimination.  *Hill*, 467 F. Supp. 2d at 356 n.23.  In this regard, Plaintiffs argue that Follett exhibited "considerable animosity towards" Nancy and Phyllis.  Pls.' Mem. at 20.  The record does reflect some tension between Plaintiffs and Follett.  For example, Plaintiffs describe Cochran as being "dismissive" toward them at their first meeting.  *See* Pls.' 56.1 ¶¶ 305-306.  Nancy also states that during the transition of the Bookstore contract from Barnes & Noble to Follett, she was "called a liar and accused of fraud" in a "rude and abusive manner," although she does not identify who made these statements or provide any additional context.  *Id.* ¶ 363.  Furthermore, Plaintiffs state that they were informed by other SCCC faculty members that Follet was spreading "negative rumors" about them and talking about them in a "negative light."  *See* Pls.' 56.1 ¶¶ 213, 216, 239, 365-66 (citing P. Sibilla Aff. ¶¶ 52-53; N. Sibilla Aff. ¶¶ 66-68).  The Court, however, cannot consider these hearsay statements by SCCC faulty members as proffered in the Sibilla Affidavits.  *See Patterson v. County of Oneida, New York*, 375 F.3d 206, 219 (2d Cir. 2004) (explaining that "an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial").

---

F.3d 17 (1st Cir. 1993).  The Court has reviewed these cases.  *Cook* is a perceived disability case involving a defendant's decision not to re-hire a plaintiff who was morbidly obese and who presented expert testimony that morbid obesity is a physiological disorder.  In *Hayes*, the court determined that there were issues of material fact whether the plaintiff could perform the essential functions of his job, with or without a reasonable accommodation to his morbid obesity.  And in *Lowe*, where the issue arose on a 12(b) motion, the court held that the Plaintiff had stated enough facts, taken as true, to plausibly allege that her obesity was a disability.  None of these cases address a "gender plus obesity" or "gender plus weight" legal theory.

Even viewing the admissible evidence in the light most favorable to Plaintiffs, this conduct does not give rise to an inference of discrimination.  There is nothing suggesting that the "animosity" was reflective of a biased attitude.  The anti-discrimination laws do not establish a general civility code and rude comments are insufficient to show discriminatory animus absent some connection to the Plaintiffs' membership in a protected class.  *See Krys v. Ysrael A. Seinuk, P.C.*, No. 09-CV-5161, 2010 WL 2654632, at *6 (S.D.N.Y. July 2, 2010).  Notably, Plaintiffs do not dispute that they never heard any comments from anyone at Follett regarding their age or sex (or weight).  Pls.' 56.1 ¶ 230.[9]

*      *      *      *

For the reasons discussed above, Plaintiffs have not made out a *prima facie* case of employment discrimination and Defendant's motion for summary judgment should be granted on those grounds.  Nevertheless, for the sake of completeness, the Court will discuss the remaining factors of the *McDonnell Douglas* framework.

**B.      Follett's Non-discriminatory Reasons for Its Staffing Decisions and Whether Those Reasons Are Pretextual**

 Once a defendant articulates a non-discriminatory reason for the employment action at issue, the presumption of discrimination drops from the case and in order for the case to continue, the plaintiff must come forward with evidence that the non-discriminatory reason is a mere prextext for actual discrimination.  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.

---

[9]      Plaintiffs also argue that the fourth prong of the *prima facie* case (circumstances giving rise to an inference of discrimination) is satisfied because "Follett's explanation for its conclusion was implausible."  Pls.' Mem. at 20.  Plaintiffs cite no evidence to support this argument and it is unclear to the Court exactly what Plaintiffs are arguing.  To the extent that Plaintiffs are proffering that Follett's stated reasons for its decisions not to hire Plaintiffs for the positions that they sought is pretextual, that argument is addressed in Section IV.B. *infra*.

29

2000).  "The plaintiff must 'produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action.'"  *Id.* (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F. 3d 708, 714 (2d Cir. 1996)) (internal alterations omitted).  In the summary judgment context, this means the plaintiff must establish a genuine issue of material fact through the introduction of admissible evidence whether the employer's stated reasons are false and whether a discriminatory reason motivated the employer to take the action it took.  *Vinokur v. Sovereign Bank*, 701 F. Supp. 2d 276, 287 (E.D.N.Y. 2010).

Defendant offers two reasons to justify its staffing decisions with respect to Plaintiffs: (1) Nancy and Phyllis did not interview well; and (2) Follett's anti-nepotism policy prevented Nancy from supervising Phyllis at the Grant Campus Bookstore.  In response, Plaintiffs argue that Follett's conclusions with respect to them "make no sense" because: (1) their duties were the same as the duties of the managers at the Riverhead and Ammerman stores; and (2) Plaintiffs "frequently bailed out their counterparts in Riverhead - the same people who Follett awarded with management positions."  Pls.' Mem. at 22-23.[10]

---

[10]     Although not argued in their brief, Plaintiffs state in their Rule 56.1 statement that "Follett's explanation for not keeping Nancy on as Store Manager because they needed someone who was familiar with their computer system is not true.  None of these three (3) women (Phelps, Robin [Karlsen] or Arhangelsky) were familiar with the Follett computer system."  Pls.' 56.1 ¶ 372.  The Court need not address this diversionary issue because Follett's proffered explanation is not that Phelps, Karlsen and Arhangelsky were familiar with the Follett computer system, but rather that Plaintiffs did not demonstrate that they were the best candidates for the positions they sought during their interviews.

The Court finds that the Sibillas' interview performance is a legitimate reason for the Defendant's staffing decisions with respect to them. The Second Circuit has stated the following regarding an employer's prerogative to rely on subjective hiring criteria:

> [t]here is nothing unlawful about an employer's basing its hiring decision on subjective criteria, such as the impression an individual makes during an interview." *Byrnie*, 73 F. Supp. 2d at 213. At the same time, we have also cautioned that "an employer may not use wholly subjective and unarticulated standards to judge employee performance for purposes of promotion." *Knight v. Nassau County Civil Serv. Comm'n*, 649 F.2d 157, 161 (2d Cir.1981). This is because "[a]ny defendant can respond to a [discrimination charge] with a claim of some subjective preference or prerogative and, if such assertions are accepted, prevail in virtually every case." *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1040 (2d Cir.1979) (internal quotation marks omitted). Accordingly, an "employer's explanation of its reasons must be clear and specific" in order to "afford the employee a full and fair opportunity to demonstrate pretext." *Meiri v. Dacon*, 759 F.2d 989, 996-97 (2d Cir.1985). Where an employer's explanation, offered in clear and specific terms, "is reasonably attributable to an honest even though partially subjective evaluation of . . . qualifications, no inference of discrimination can be drawn." *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir.1980).

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 104-105 (2d Cir. 2001) (alterations in original). Following these guidelines, courts have held that poor performance at a job interview is a legitimate, nondiscriminatory reason for not offering a position to an individual and that the criteria used to evaluate a candidate may be subjective so long as it is explained in clear and specific terms. *See, e.g.*, *Abraham v. New York City Dep't of Educ.*, No. 06-CV-1053, 2009 WL 1194164, at *7 (S.D.N.Y. April 30, 2009)*, aff'd*, 398 Fed Appx. 633 (2d Cir. 2010); *Rouse v. City of New York*, No. 08-CV-7419, 2009 WL 1532054, at *8 (S.D.N.Y. June 2, 2009); *Pathare v. Klein*, No. 06-CV-2202, 2008 WL 4210471, at *6 (S.D.N.Y. Sept. 12, 2008)*, aff'd*, 347 Fed. Appx. 646 (2d Cir. 2009); *Hurd v. New York Health & Hosps. Corp.*, No. 04-CV-998, 2007 WL

678403, at *4 (S.D.N.Y. March 5, 2007), *aff'd*, No. 07-CV-1250, 2008 WL 5120624 (2d Cir. Dec. 8, 2008); *Bunk v. Gen. Servs. Admin.*, 408 F. Supp. 2d 153, 157-58 (W.D.N.Y. 2006); *Richane v. Fairport Cent. Sch. Dist.*, 179 F. Supp. 2d 81, 86 (W.D.N.Y. 2001); *Wechsler v. R D Mgm't Corp.*, 861 F. Supp. 1153, 1160 (E.D.N.Y. 1994).

The explanation offered by the Defendant satisfies the standard articulated in *Byrnie*. Based on her interview of Phyllis Sibilla, which Phyllis described as "horrible," Follett representative Jeanne Bosbach concluded that Phyllis performed mainly non-managerial accounting duties, many of which would no longer be performed at the Grant Campus given Follett's systems and processes.  Def.'s 56.1 ¶¶ 123-34.  In Follett's operations, accounting tasks and duties are not performed at any individual bookstores.  *Id.* ¶ 156.  In addition, Bosbach was given the impression that Phyllis spent the majority of her time in the office on these accounting functions, rather than on the sales floor where Follett managers are expected to spend a significant portion of their time.  Bosbach Tr. at 139-40.  According to Bosbach, Phyllis described her job functions as follows:

> She told me she does the accounting functions.  She told me that she can open and close, but Nancy does it for her.  She told me that she does the bookkeeping.  She told me that she does the deposit.  But then Nancy delivers it for her.  She told me that she can hire.  But Nancy does it, does the hiring.

*Id.* at 79.  Bosbach also felt that Phyllis did not convey strong customer service skills and testified that Phyllis did not "speak to the staff, being out on the floor, [and] driving customer service" when Bosbach inquired into these areas.  *Id.* at 129.  Bosbach "was very surprised how much [Phyllis] brought Nancy up as far as what Nancy does for her" and left the interview wondering "what management duties she actually performed and how that would transfer over to Follett." *Id.* at 125-6.

Indeed, Phyllis herself acknowledged that her interview was "horrible."  *See* P. Sibilla Tr. at 202-203.  In her Affidavit submitted in opposition to summary judgment Phyllis states that she thought the interview was horrible "based upon the offer that I received."  P. Sibilla Aff. ¶ 32. Defendant argues that this interpretation contradicts Phyllis's prior deposition testimony.  On this point, Phyllis testified as follows:

> Q:    How did you feel your interview went after it was over?
>
> A:    I thought it was a horrible interview.
>
> Q:    Why did you think it was a horrible interview?
>
> A:    Because I'm not used to being interviewed.
>
> Q:    You thought you didn't perform well in the interview?
>
> A:    Yes.
>
> Q:    In what respect did you feel that you did not perform well?
>
> A:    I feel as though I choked up.  I don't know what to say or how to say it the correct way.
>
> Q:    Was there anything else that you contributed to your opinion that it was a horrible interview?
>
> A:    No.
>
> Q:    Were you concerned that perhaps because you had given a horrible interview your job might be in jeopardy?
>
> A:    No.
>
> Q:    Why not?
>
> A:    I don't know, it just never occurred to me.
>
> Q:    Did you tell anyone after your interview that you thought the interview had not gone well?

> A:      I told Nancy.

*See* P. Sibilla Tr. at 202-203.  The Court finds that the only reasonable interpretation of Phyllis'

testimony is that she felt the interview was horrible as a result of her poor performance, and not as

a result of the offer that came later.

As to Nancy's interview, Follett representative Amantha Nyberg concluded that Nancy did

not interview well and focused on the textbook and text management aspects of the position.  *Id.*

¶¶ 138-145.   Follett, as a result, offered Nancy Sibilla the Text Manager position because 80%

of her time was dedicated to text duties and because "her interview with [Follett] revealed that

this was where her passion was."  *Id.* ¶¶ 192-95.   According to Nyberg, the "emphasis seemed to

be on the text functions of her job" and Nyberg described the interview as follows:

> My impression was that she was nervous.  She did share with me that
> she was nervous.   My impression was, I did not see or feel any
> excitement, enthusiasm about the job.  I had to ask the questions more
> than once.  She was giving me one word answers, not elaborating on
> the various things she did.  And I had to do quite a bit of probing.

Nyberg Tr. at 140-42.  Nyberg also found the following areas problematic:  Nancy's lack of

"[e]ye contact, lack of enthusiasm, one word answers, [and the failure to] give good examples of

the things I was asking."  *Id.* at 144.

Both interviews were conducted pursuant to a standardized template that was used with

other SCCC interviewees.  *Id.* ¶¶ 95-96.[11]   In the conversations between Bosbach, Nyberg, and

---

[11]      The Court notes that the alternative reasoning advanced by Defendant, i.e., that Follett's
anti-nepotism policy prevented it from hiring the Sibillas, is problematic.  Follett's anti-nepotism
policy set forth in the Follett Code of Conduct provides that: "No relative of a Follett person will
be employed by and work in a division or department controlled or managed by that Follett
person without advance clearance from the President or Chairman."  Def.'s 56.1 ¶ 119 (citing
Sack Decl., Ex. R at 120-21).  The Court's reading is that the policy is not absolute; rather in
order for an individual to work in a division or department controlled or managed by a relative,

Cochran that followed the interviews, there was no discussion or consideration of the age, gender, weight, or medical condition of the Sibillas.  Nyberg Tr. at 146-48.

Although Plaintiffs dispute some of the conclusions reached by Follett representatives regarding the interviews, including whether Phyllis conveyed that she performed mainly accounting functions, *see* Pls.' 56.1 ¶¶ 123-34, they have not met their burden to introduce evidence that establishes a genuine issue of material fact regarding whether discrimination was the real reason for the staffing decisions.  *See Vinokur*, 701 F. Supp. 2d at 287.  Plaintiffs' sole argument on this issue is that they were more qualified than the other former Barnes & Noble SCCC employees (Phelps, Karlsen, and Arhangelsky) who received manager positions at Follett.  "[A]n employee's subjective opinion about his [or her] qualifications is insufficient to give rise to a triable issue of fact concerning whether the employer's proffered reason is a pretext for discrimination . . . ."  *Bunk*, 408 F. Supp. 2d at 157.   As stated by the Second Circuit:

> When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful

the President or Chairman of Follett must provide clearance.  There is no indication that clearance was sought and denied with respect to the Sibillas.  Moreover, the Code of Conduct does not define "division or department" and it would be reasonable to interpret the policy as preventing Nancy from managing the campus bookstore division (assuming there was one) or from serving as Store Director of the SCCC Bookstores, but that it did not prevent Nancy from serving as Store Manger at the Grant Campus if Phyllis was an Assistant Manager there.  In other words, it is not clear from the record that the individual Grant Campus Bookstore was a "division or department" within the meaning of the Code of Conduct, nor is it clear what position was charged with managing or controlling the Grant Campus Bookstore.  Moreover, even if the Court accepts Follett's interpretation of the Code of Conduct, the anti-nepotism policy would only explain Follett's failure to hire one of the Sibillas.  The policy did not prevent Follett from hiring *both* sisters for the positions they sought.

35

> discrimination. In effect, the plaintiff's credentials would have to be
> so superior to the credentials of the person selected for the job that
> "no reasonable person, in the exercise of impartial judgment, could
> have chosen the candidate selected over the plaintiff for the job in
> question."

*Byrnie*, 243 F.3d at 103 (quoting *Deines v. Tex. Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 280-81 (5th Cir.1999)).  Significantly, Plaintiffs do not compare their qualifications to the relevant  employees – the employees who received the positions they sought (Ben Surek and Mark Yetman).  Even if it were proper to focus on the qualifications of Phelps, Karlsen, and Arhangelsky as Plaintiffs do here, Plaintiffs have not demonstrated that *Plaintiffs'* credentials were so superior to those of Phelps, Karlsen, and Arhangelsky that a reasonable trier of fact could only conclude that Follett's stated rationale was pretextual.  Plaintiffs cite Nancy Sibilla's Affidavit for the proposition that Arhangelsky and Phelps were less experienced than Nancy.  Pls.' 56.1 ¶ 353 (citing N. Sibilla Aff. ¶ 30).  Nancy states in her Affidavit that Arhangelsky "came to me with questions and problems performing the essential functions of her job."  N. Sibilla Aff. ¶ 31.  She adds that Phelps frequently made mistakes and she assisted Phelps with her job duties.  *Id*. ¶ 33.  Nancy did not provide any details about these problems and there is no indication in the record that Follett was aware of them.  As to Phyllis, Plaintiffs rely on the following excerpt from the testimony of Barnes & Noble Regional Manager Ray McGale:

> Q:    How did Lori's work compare to that of Phyllis Sibilla?
>
> A:    Phyllis?
>
> Q:    Yes.
>
> A:    Phyllis was much more knowledgeable in her job than Lori was at hers.
>
> Q:    Is that based upon your observations?

A:      Yes.  Phyllis had more years of experience.

Gabor Decl., Ex. CC (McGale Tr.) at 61.

Viewing this evidence in the light most favorable to Plaintiffs, the Court is not persuaded that the discrepancy in the qualifications between Plaintiffs and Phelps, Karlsen, and Arhangelsky is sufficiently stark to allow the Court to conclude that there are genuine issues of fact regarding whether Follett's proffered explanation is a pretext for unlawful discrimination.  Notably, the fact that Plaintiffs had more substantive experience than Phelps, Karlsen, and Arhangelsky is less significant given that Follett was implementing new systems and procedures.

The role of the Court is "not to evaluate the wisdom of personnel decisions, but merely to determine whether the decisions were rational and non-discriminatory."  *Sarmiento v. Queens Coll. CUNY*, 386 F. Supp. 2d 93, 97-98 (E.D.N.Y. 2005); *accord Hurd*, 2007 WL 678403, at *5 ("In analyzing discriminatory hiring or promotion claims, the Court does not function as a Human Resources oversight committee, reviewing relative qualifications to determine if the 'best' choice was made.").  The fact that Phelps, Karlsen, and Arhangelsky may have made some mistakes throughout the course of employment with Barnes & Noble and had less experience than Plaintiffs does not mean that it was unreasonable for Follett to offer them the positions that it did.

In any event, and as noted previously, Phelps, Karlsen, and Arhangelsky are women and Phelps is also in a protected class based on age.  Thus, even if these three women were less qualified, selecting them over Plaintiffs does not demonstrate bias.  Moreover, the fact that Rosemary Conetta, a woman under 40, was offered a position that she considered a demotion and was offered less pay than her position at Barnes & Noble, *see* Def.'s 56.1 ¶¶ 28, 175, weighs strongly against a finding that Plaintiffs' age was the true reason for Follett's staffing decisions.  *See Chow v. Stride Rite Corp.*,

No. 05-CV-2417, 2009 WL 196030, at *10 (S.D.N.Y. Jan. 27, 2009) (holding that fact that employer also terminated non-pregnant women was strong evidence that plaintiff's pregnancy was not the reason for her termination) (citing *Jessamy v. City of New Rochelle, New York*, 292 F. Supp. 2d 498, 516 (S.D.N.Y. 2003) (holding that plaintiff could not even establish a *prima facie* case of discrimination where employee outside his protected class was treated identically)).

Finally, the Court notes that Plaintiffs' focus on their performance at Barnes & Noble is misplaced. Plaintiffs submitted pages and pages of evidence regarding their successful operation of the Bookstore for Barnes & Noble. *See* Pls.' 56.1 ¶¶ 265-282, 289-300. The Defendant for all intents and purposes has not disputed that assertion. By all accounts, the Sibillas were competent and well-liked employees of Barnes & Noble for many years. Unfortunately, that is not the issue on which this case turns. The issue before the Court is not whether Plaintiffs performed well for Barnes & Noble, but rather whether Follett's decision was proper based on the information it had at the time. *See Warren v. North Shore Univ. Hosp. at Forest Hills*, 268 Fed. Appx. 95, 99 (2d Cir. 2008) (holding that issue wasn't whether applicant actually worked well with patients, but whether employer received negative feedback about employee and based his hiring decision on that feedback); *Gambello*, 186 F. Supp. 2d at 223 (stating that focus of court was on perceptions of decisionmakers, not the opinions of employee's peers who regarded him as competent). Because Barnes & Noble was its competitor, Follett did not ask Barnes & Noble for references for any of the employees applying for jobs at Follett, nor did anyone from Follett talk to anyone from Barnes & Noble about the quality of work performed by any Barnes & Noble employee at SCCC. Def.'s 56.1 ¶¶ 98-99. Thus Plaintiffs' success at Barnes & Noble has little bearing on the decision-making process employed by Defendant.

38

In sum, Plaintiffs have not identified any genuine issue of fact to show that age, gender, or disability discrimination was the real motivating factor behind Follett's decisions.  In reaching this conclusion, the Court is mindful that in determining whether a genuine issue of material fact exists for trial, it is obliged to "distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture."  *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005).  In this case, the evidence put forward by the Plaintiffs falls into the latter category.

## V.   CONCLUSION

For the reasons set forth above, the Defendant's motion for summary judgment is GRANTED.

**SO ORDERED.**

Dated:        Central Islip, New York
                 March 30, 2012

                                                /s/ A. Kathleen Tomlinson
                                                A. KATHLEEN TOMLINSON
                                                U.S. Magistrate Judge